## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | 2:12-cr-00203 |
| | ) | |
| v. | ) | Chief Judge Mark R. Hornak |
| | ) | |
| ERIC ALAN SCOTT INGRAM, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Before the Court is Mr. Eric Alan Scott Ingram's Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), in which he argues that he has serious medical conditions that so increase the risk of contracting a severe case of COVID-19 as to warrant a reduction in his sentence in the form of compassionate release. (ECF No. 58.) While the Court finds that Mr. Ingram's Motion is properly before it, and that his medical conditions in combination with the COVID-19 pandemic rise to an "extraordinary and compelling" level, the Court concludes that release is not warranted at this time based on the record before the Court. Because Mr. Ingram's offense conduct and record of recidivism indicates that release at this time would undermine the sentencing goals of protecting the public and deterring Mr. Ingram from further future criminal conduct, the Court concludes that a sentence reduction would not be consistent with the factors set forth in 18 U.S.C. § 3553(a). Accordingly, the Defendant's Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) at ECF No. 121 is DENIED without prejudice subject to its reassertion should circumstances warrant.

1

I.    **BACKGROUND**

On June 6, 2013, Mr. Ingram pled guilty to committing an unarmed bank robbery in violation of 18 U.S.C. Sec. 2113(a). (ECF No. 29.) The sentencing court determined that Mr. Ingram was a career offender based on prior bank robbery convictions in 1992 and 1998 and imposed a 168-month sentence. (ECF No. 45.) Mr. Ingram is currently incarcerated at U.S. Penitentiary (USP) Allenwood, a high security facility, and is scheduled to be released on April 18, 2024. Therefore, as of the date of this Opinion, Mr. Ingram has served about 127 months of actual incarceration and has 41 months remaining on his sentence, not accounting for any "good time" credit.

Mr. Ingram is now fifty (50) years old. Medical records from the BOP document that he suffers from multiple pre-existing medical conditions. (ECF No. 58-2, at 3, 4, 7, 8, 18, 21.) Among these, Mr. Ingram argues that several conditions constitute extraordinary and compelling circumstances justifying his release, including his chronic hepatitis C., rheumatoid arthritis, use of immunosuppressant arthritis medication, obesity, depression, and hyperlipidemia. (ECF No. 58, at 1.) Mr. Ingram further provides letters from personal references and prison officials testifying to his efforts at rehabilitation while incarcerated, and proposes a release plan including potential employment, continuing substance abuse treatment, and a stay in a "three-quarters-house." (ECF Nos. 58-3, 58-4, 58-5, and 79.)

In response, the Government argues that Mr. Ingram's medical conditions do not rise to an "extraordinary and compelling" level warranting release under § 3582(c)(1)(A)(i). (ECF No. 67.) In addition, the Government argues that consideration of the 18 U.S.C. § 3553(a) factors weighs against release, particularly in view of Mr. Ingram's repeated history of recidivism shortly after release from prior incarcerations.

## II.   <u>LEGAL STANDARD</u>

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007); *see also Dillon v. United States*, 560 U.S. 817, 819 (2010) ("A federal court generally may not modify a term of imprisonment once it has been imposed."). One such specific authorization is the First Step Act's amendment of 18 U.S.C. § 3582. As amended, that provision allows a court to modify a defendant's term of imprisonment if "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i). In addition, the court must consider: (1) whether the defendant has exhausted the appropriate administrative remedies; (2) the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable; and (3) whether such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. § 3582(c)(1)(A).

Here, the Court finds that although Mr. Ingram's motion is properly before it and his medical conditions rise to an "extraordinary and compelling level" in light of the COVID-19 pandemic, release is not appropriate under the § 3553(a) factors.

## III.   <u>DISCUSSION</u>

### A.   <u>Administrative Exhaustion</u>

Before considering this Motion's merits, the Court must first determine that Mr. Ingram has complied with § 3582(c)(1)(A)'s exhaustion requirement. Prior to the enactment of the First Step Act, only the Director of the BOP could file a motion for compassionate release. The First Step Act, however, amended § 3582 to permit an inmate to file a motion in federal court seeking compassionate release, but only after fully exhausting "all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from

the receipt of such a request by the warden of the defendant's facility, whichever is earlier."
§ 3582(c)(1)(A).

Specifically, before petitioning a court for relief under § 3582(c), the First Step Act requires that a defendant first file an administrative request for compassionate release with their facility's warden asking the Bureau of Prisons to make such a request on their behalf. § 3582(c)(1)(A). Then, defendants must also either: (1) fully exhaust the BOP's administrative remedies; or (2) wait thirty (30) days from the date their administrative request was filed with the warden. *Id.* As the Third Circuit has recently confirmed, either of § 3582(c)(1)(A)'s options are independently sufficient to satisfy the exhaustion requirement. *See United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020) (rejecting the argument that a defendant is required to completely exhaust the administrative remedy process if the warden denies a defendant's request within thirty (30) days of receiving it, primarily because "the statute states that the defendant may file the motion [before a district court] thirty days after the warden receives his request").

Here, the Government does not contest the Court's authority to adjudicate Mr. Ingram's Motion based on lack of exhaustion. However, because the Third Circuit has held that § 3582(c)(1)(A)'s exhaustion requirement is mandatory, the Court must nonetheless determine whether the exhaustion requirement is satisfied. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (mandating "strict compliance" with § 3582(c)(1)(A)'s exhaustion requirement); *see also United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [§ 3582(c)(1)(A)'s] exhaustion requirement does not implicate our subject-matter jurisdiction, it remains a mandatory condition.").

Exhaustion is met here because Mr. Ingram has demonstrated that he has satisfied § 3582(c)(1)(A)'s "thirty-day-option" as follows. First, Mr. Ingram submitted his request for

reduction in sentence to his facility's Warden on April 27, 2020, which sought relief based on the grounds that Mr. Ingram's "serious preexisting health concerns" would "seriously compromise [Mr. Ingram's] ability to survive in prison since the outbreak of the COVID-19 pandemic." (ECF No. 58-1, at 1.) The Warden issued a response denying the Mr. Ingram's request on May 8. 2020 (ECF No. 58-1, at 48), and Mr. Ingram filed his motion for reduction in sentence on August 10, 2020. (ECF No. 58 at 4.)

The Third Circuit has suggested that the fundamental premise of § 3582(c)(1)(A)'s exhaustion requirement is to give the BOP the first opportunity to consider whether release is appropriate. *Raia*, 954 F.3d at 597 ("Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance."). In Mr. Ingram's case, the record before the Court plainly demonstrates that the BOP has had since April 27, 2020 to consider the Defendant's overall medical condition, including consideration of those concerns in the context of the COVID-19 pandemic. The Court therefore finds that, as the statute requires, the BOP has had more than thirty (30) days to consider the Defendant's medical condition and to take the "first crack" at resolving his request at the administrative level. *See Harris*, 812 F. App'x 106, 107 (3d Cir. 2020). Mr. Ingram has therefore exhausted his administrative obligations. The Court will proceed accordingly.

### B.  "Extraordinary and Compelling" Reasons

The Court must now consider whether Mr. Ingram's medical conditions, when considered in the light of the ongoing COVID-19 pandemic, rise to an "extraordinary and compelling" level such that release might be warranted under § 3582(c)(1)(A)(i).

Section 3582 does not define the phrase "extraordinary and compelling reasons." Instead, Congress delegated that task to the Sentencing Commission. *See* 28 U.S.C. § 994(t) (stating that

the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). The Sentencing Commission defined "extraordinary and compelling" in relation to the BOP's discretion under the pre-First Step Act version of § 3582(c)(1)(A)(i), but has not updated the applicable Policy Statement, found in the U.S. Sentencing Guidelines Manual ("the Guidelines") § 1B1.13, since the First Step Act became law. *See United States v. Rodriguez*, 451 F. Supp. 3d 392, 397 (E.D. Pa., 2020).

Although the relevant portions of the Guidelines predate the passage of the applicable provisions of the First Step Act and are advisory, they do provide some initial benchmarks for the Court's consideration. *See id.* at 397 ("[A] majority of district courts have concluded that the 'old policy statement provides helpful guidance, [but] . . . does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A).'") (quoting *United States v. Beck*, 425 F. Supp. 3d 573, 582 (M.D.N.C. 2019)). For example, the Policy Statement provides that a defendant may show "extraordinary and compelling" reasons for compassionate release based on the defendant's medical condition, age, family circumstances, or "other reasons." § 1B1.13, cmt. n.(1).

Specifically, the Application Notes to § 1B1.13 of the Guidelines articulate two (2) types of medical conditions that can rise to an "extraordinary and compelling" level: (1) terminal illnesses; and (2) non-terminal conditions that substantially diminish the ability of the defendant to provide self-care within the correctional environment. The Sentencing Commission's Policy Statement suggests that non-terminal medical conditions may constitute extraordinary and compelling reasons if "a defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within

the environment of a correctional facility and from which he or she is not expected to recover." § 1B1.13, cmt. n.(1)(A)(ii). None of Mr. Ingram's conditions constitute a "terminal illness" under the comments' definition.

However, the Court concludes that the combination of Mr. Ingram's obesity and immunosuppressant medication sufficiently exacerbate his risk of contracting a severe case of COVID-19 as to rise to an "extraordinary and compelling" level under the "non-terminal" option. The Third Circuit has held that when a defendant asserts "extraordinary and compelling" reasons based on a non-terminal condition in combination with the COVID-19 pandemic, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's . . . extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. In other words, a defendant's motion for compassionate release based in part on COVID-19-related concerns must move beyond "citing to nationwide COVID-19 statistics, asserting generalized statements on conditions of confinement within the BOP, or making sweeping allegations about a prison's ability or lack thereof to contain an outbreak." *United States v. Graham*, No. 12-cr-184, 2020 WL 3053106, at *4 (W.D. La. June 8, 2020) (citing *Raia*).

Here, Mr. Ingram's motion meets the requirements articulated in *Raia* by asserting sufficiently severe health risks that are specific to him, rising beyond generalized assertions and differentiating his COVID-19 related concerns from those of other inmates. Specifically, two (2) of Mr. Ingram's medical conditions–obesity and the use of immunosuppressant arthritis treatment– appear on the CDC's amended list of "high risk" conditions, which distinguishes between underlying medical conditions that *do* place an individual at increased risk and underlying medical conditions that *might* place an individual at increased risk. *See People with Certain Medical*

*Conditions*, Ctrs. for Disease Control & Prevention (last updated October 16, 2020), https://bit.ly/2CrTAqa.

Notably, Bureau of Prisons ("BOP") records indicate that Mr. Ingram is obese. The combination of Mr. Ingram's BOP-documented height of 5'9" (PSR ¶51) and his weight of 225 pounds (ECF No. 58-2, at 8) yields a BMI of 33.2 per publicly available BMI screening calculators. *See* Natl. Heart, Lung, and Blood Institute, *Calculate Your Body Mass Index*, US Dept. of Health & Human Services https://www.nhlbi.nih.gov/health/educational/lose_ wt/BMI/ bmicalc.htm (last reviewed Oct. 21, 2020). Therefore, under the CDC definition of obesity as encompassing those with a BMI of above 30, Mr. Ingram 's BMI places him in the obese category. *Id.* (*See* PSR ¶51.) Importantly, the CDC straightforwardly lists obesity as a medical condition that "does" increase the risk for severe illness from COVID. Ctrs. for Disease Control & Prevention, *People of Any Age with Underlying Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last reviewed Oct. 21, 2020).

In response to Mr. Ingram's Motion, the Government argues that Mr. Ingram's obesity cannot constitute an extraordinary and compelling circumstance because he has not been officially diagnosed as obese and instead provides a self-calculated BMI based on his height and weight. (ECF No. 67, at 13–15.) Conceding that an official or "formal" diagnosis of obesity *would* constitute an extraordinary and compelling reason were Mr. Ingram to obtain one, the Government notes that it would not oppose a continuance for him to do so. (ECF No. 67, at 14–15.)

But the Court finds that such a formal diagnosis is unnecessary here. Department of Justice guidance has referenced as authoritative CDC COVID-19 guidelines defining obesity as "body mass index of 30 or above" and conceded that a BMI of above 30 can constitute an extraordinary

and compelling reason, indicating that the Government accepts the over-30-BMI benchmark as an obesity estimate. *United States v. Steven Cole*, No. 1:18-cr-167, Doc. 95 (D.Md., July 30, 2020). Furthermore, the concerns the Government cites here regarding the accuracy of BMI as a proxy for obesity are based on that tool's inability to consider proportions of body fat versus muscle. (ECF No. 69 at 13–14, *citing* Ctrs. for Disease Control & Prevention, *Body Mass Index: Considerations for Practitioners,* https://stacks.cdc.gov/view/cdc/25368; Medical News Today, "Why BMI is inaccurate and misleading," https://www.medicalnewstoday.com/articles/265215.) Nothing in the record here suggests that this concern applies to Mr. Ingram: on March 30, 2020, BOP medical staff calculated Mr. Ingram's BMI at 33.2, described his physical appearance as "overweight," noted that his glucose level was elevated, and ordered a diabetes screening. (ECF No. 58-2, at 3, 10.) Mr. Ingram's BMI calculation using his BOP-documented height and weight is sufficient here to show that he is obese and, per CDC guidance, at higher risk for contracting severe illness from COVID-19.

Additionally, Mr. Ingram's already-elevated risk of contracting a severe case of COVID-19 is compounded by his use of immunosuppressant arthritis medication. Records from the BOP indicate that Mr. Ingram developed rheumatoid arthritis as a response to interferon treatment for Hepatitis C. (ECF No. 58-2, at 2, 8). To treat his arthritis, Mr. Ingram currently receives periodic injections of "Kenalog," a type of "synthetic glucocorticoid corticosteroid" used to treat joint pain, swelling, and stiffness caused by inflammatory disorders. (ECF No. 58, at 17; ECF No. 58-2, at 5, 18, 22.) Kenalog has the documented side effect of reducing immune system activity – which makes it easier to get an infection including COVID-19.

The condition of having a weakened immune system appears on the CDC's "might list" as a factor increasing the risk of contracting a severe illness from COVID-19. Ctrs. for Disease

9

Control & Prevention, *People of Any Age with Underlying Medical Conditions* (last reviewed Oct. 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  In fact, the CDC lists a "weakened immune system" as a condition that "might" put a person at increased risk for more severe illness from COVID specifically where that weakened immune state is related to "use of corticosteroids, or use of other immune weakening medicines." *Id.*

The Government contests whether Mr. Ingram's use of Kenalog injections do in fact significantly heighten his COVID-19 risks, arguing that that corticosteroid use is higher risk at more prolonged or higher doses than those that Mr. Ingram receives. (ECF No. 67, at 11–12.) But lower corticosteroid doses are still considered a potential risk factor for COVID-19 hospitalization, and the CDC's COVID-19 risk guidance does not discriminate between higher and lower doses of immunosuppressant medications. Regardless of dose, where those medications have the side effect of placing one in an immunocompromised state, the guidance advises that the immunocompromised person "might" have a higher risk of contracting a severe illness from COVID-19. Ctrs. for Disease Control & Prevention, *People of Any Age with Underlying Medical Conditions* (last reviewed Oct. 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

Mr. Ingram's obesity already "does" place him at higher risk of contracting a severe illness from COVID-19 under the CDC guidelines. The heightened risk of infection resulting from Mr. Ingram's use of immunosuppressant medication provides another factor increasing that risk. Together, the Court finds that these conditions so raise Mr. Ingram's risk level so as to constitute an "extraordinary and compelling" reason for the purpose of § 3582(c)(1)(A).[1]

---

[1] Mr. Ingram also argues that potential liver damage from a past Hepatitis C diagnosis places him at higher risk for contracting COVID-19. Although the Government responds that BOP documentation indicates that Mr. Ingram's

## C.  The § 3553(a) Sentencing Factors

Even though the Court finds that Mr. Ingram's medical conditions constitute "extraordinary and compelling" reasons that could warrant release, it must also consider whether release is appropriate in light of the factors set forth in § 3553(a). 18 U.S.C. § 3582(c)(1)(A). Those factors include the defendant's "history and characteristics," 18 U.S.C. § 3553(a)(1), and "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense[, and] . . . to afford adequate deterrence to criminal conduct." § 3553(a)(2)(A)–(B). Specifically, "in considering the section 3553(a) factors, [the Court] should assess whether those factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *United States v. Bess*, ──── F. Supp. 3d ────, 2020 WL 1940809, at *10 (W.D.N.Y. Apr. 22, 2020).

In addition, the Third Circuit has recently reaffirmed that the determination of whether to reduce an eligible defendant's term of incarceration for compassionate release after considering the § 3553(a) factors is committed to the discretion of the district court. *United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020). That discretion includes the district court's ability to consider the length of the defendant's original custodial sentence, including the portions served and remaining, when weighing the § 3553(a) factors. *Pawlowski*, 967 F.3d at 330–31.

Here, the Court concludes that consideration of the § 3553(a) sentencing factors demonstrates that the factors supporting denial of the requested relief outweigh the impact of the

---

Hepatitis C diagnosis does not pose such a risk because it has been "resolved" for a period of years, ECF No. 67, at 9–10 (citing ECF No. 58-3 at 33, 34), Mr. Ingram argues that his Hepatitis C history places him at higher risk of contracting severe illness from COVID-19 based on medical research showing that Hepatitis C may weaken a person's immune system for years after treatment has been successful. (ECF No. 72, at 7). But because the Court has concluded that the "extraordinary and compelling" threshold is met by the combination of Mr. Ingram's obesity and corticosteroid use, the Court need not resolve whether Mr. Ingram's Hepatitis C history or other stated conditions (including depression and hyperlipidemia) constitute extraordinary and compelling circumstances.

extraordinary and compelling health considerations at issue here. Specifically, the Court finds that two (2) of the § 3553(a) factors significantly militate against Mr. Ingram's release now: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, and (2) the need for the original sentence to deter future criminal conduct and to protect the public from further crimes by the defendant. In considering Mr. Ingram's history of recidivism, the Court concludes that Mr. Ingram's showing of extraordinary and compelling reasons does not sufficiently mitigate the risk of harm to the community were Mr. Ingram to be released.

Mr. Ingram's criminal record begins with two juvenile adjudications. At the age of 16, Mr. Ingram was adjudicated guilty of forcible rape of an 18-year-old female victim. (PSR ⁋ 22.)  In addition, Mr. Ingram was separately adjudicated guilty of criminal damaging for breaking into automobiles and taking radios and personal property from those vehicles. (PSR ⁋ 21.) Mr. Ingram argues that these adjudications should not be considered as demonstrating his present danger to the community if released. (ECF No. 72, at 11.) But even if the Court does not consider those adjudications here, the record reveals that Mr. Ingram has an extensive record of convictions for serious offenses as an adult.

Mr. Ingram's record of criminal convictions as an adult begins with his theft of a taxicab using a knife on November 15, 1990. (PSR ⁋ 23.) Mr. Ingram pled guilty to robbery as a result and served approximately 8-9 months in prison. *Id.* Then, in February 1992, two (2) months after Defendant was paroled for that offense, he was arrested for simple assault and found guilty of disorderly conduct for an incident in which he attempted to cause bodily injury to his mother. (PSR ⁋ 25.)  On February 27, 1992, one week after his disorderly conduct conviction and two and a half (2.5) months after having been paroled for his robbery conviction, Mr. Ingram robbed a bank by handing the teller a note demanding money and stating that he possessed plastic explosives that he

would use if he saw the police. (PSR ¶ 26.)  Three (3) weeks later, on March 18 and 19, 1992, Mr. Ingram committed two (2) bank additional robberies in identical fashion at different banks. (PSR ¶ 26.)  Mr. Ingram pled guilty to Bank Robbery and was sentenced to eighty-four (84) months imprisonment. (PSR ¶ 26.)  On July 10, 1998, he was placed on supervised release.

Twenty-one (21) days after his release from imprisonment for the 1992 bank robberies, on July 31, 1998, Mr. Ingram robbed another bank, again by providing the teller with a note demanding money and stating that he had explosives. (PSR ¶ 27.) He pled guilty to Bank Robbery, was sentenced to 151 months' imprisonment, and was released on May 6, 2011. (PSR ¶ 27.)  And finally, approximately nine (9) months after his release for that offense, Mr. Ingram engaged in the criminal conduct that resulted in the prosecution and sentence at issue here: On February 21, 2012, Mr. Ingram robbed another bank, again using a note that demanded money and threatened the use of explosives. The next day, he robbed an additional bank in the same manner. Again, Mr. Ingram pled guilty to Bank Robbery. (ECF No. 29.) Judge McVerry sentenced Defendant to 168 months imprisonment. (ECF No. 45.)

Mr. Ingram's history of adult criminal convictions gives the Court substantial concern that he will not refrain from committing future offenses if released, or that release from custody forty-one (41) months early is justified. Both Mr. Ingram's past bank robberies and his commission of many of those offenses shortly after being released from custody are cause for substantial public safety concerns. And given that the purpose of the 168-month sentence was to protect the public and to deter Mr. Ingram from further criminal conduct, releasing him at this point would in the Court's judgment undermine those goals. Mr. Ingram has served prior sentences of incarceration for those offenses of 84 and 151 months, respectively, and recidivated shortly after his release from custody in both cases. (PSR ¶ ¶ 27, 28.) Considering that those prior sentences were

insufficient to deter Mr. Ingram from future offenses, it is difficult to conclude that a materially reduced sentence will be sufficient to afford just punishment and provide adequate deterrence under § 3553(a)(2)(A)–(B) and to otherwise protect the public. And because there is no evidence that any of Mr. Ingram's asserted medical conditions would moderate his conduct, the record also does not demonstrate that he would be deterred or constrained from committing future offenses by virtue of his medical situation.

Mr. Ingram argues that the remainder of his sentence is unnecessary for deterrence because of his rehabilitation in prison. Specifically, Mr. Ingram demonstrates that he has received treatment for mental illness and substance abuse while in prison, attaches a letter from a correctional officer and from a prison psychologist praising his conduct, and also includes letters from his mother and from a church official detailing their beliefs that Mr. Ingram has been rehabilitated due to his mental health treatment. (ECF No. 58 at 38-40; ECF No. 58-3; ECF No. 58-4; ECF No. 58-5, at 1, 4.) While the Government correctly notes that these positive accounts are complicated by Mr. Ingram's disciplinary record during his current sentence,[2] Mr. Ingram's exhibits do provide commendable signs of rehabilitation. For example, the letter from a correctional counselor who also served as Mr. Ingram's supervisor characterized him as a model inmate who serves as a mentor to others. (ECF No. 58-3.) Similarly, the letter from a prison psychologist praised Mr. Ingram's initiative and professionalism in creating a mural in the prison's Psychology Services Department. (ECF No. 58-4.)

Nevertheless, Mr. Ingram's record of recidivism indicates that release would substantially undermine the sentencing goals of protecting the public and deterring Mr. Ingram from further

---

[2] Mr. Ingram was disciplined by the BOP during the pendency of his current sentence for refusing to obey orders in 2014, for fighting with another person in 2016, and on two separate occasions in 2017 for the use of drugs and alcohol.  (ECF No. 67, at 4.)

future criminal conduct. As recounted above, between 1992 and 2012, Mr. Ingram robbed six (6) banks. In all instances, Mr. Ingram committed those bank robberies while on parole or supervised release, shortly after having been released from confinement for prior offenses. And in all instances, although Mr. Ingram was unarmed, he committed those robberies using notes that threatened the use of explosives. These repeated threats of violence only add to the concerns for public safety prompted by Mr. Ingram's prior convictions for robbery and disorderly conduct, both of which involved violent conduct (respectively, the PSR reports that those offenses involved holding a knife to a taxi driver's throat, and attempting to cause bodily injury to his mother) (PSR ¶¶ 23, 25).

The Court recognizes Mr. Ingram's efforts at rehabilitation. But based on the record before it, the Court cannot confidently say that additional incarceration is not needed to prevent Mr. Ingram from committing additional offenses or to protect the public from his commission of additional offenses. Instead, the sentence imposed continues to be necessary to protect the public from further crimes of the defendant, as well as to reflect the seriousness of the offense, provide just punishment, and deter the defendant and others.

Thus, the Court concludes that the "extraordinary and compelling" nature of Mr. Ingram's medical conditions does not so counterbalance the application of the § 3553(a) factors as noted above. The Court also cannot and does not conclude that the quality of Mr. Ingram's medical care at USP Allenwood has been insufficient or inappropriate. To the contrary, Mr. Ingram's Motion and attached BOP medical records indicate that he regularly receives corticosteroid treatment for his arthritis, that the BOP has monitored Mr. Ingram's weight and ordered diabetes screening when necessary, and that he has received effective treatment at USP Allenwood for substance abuse and mental health problems. (ECF No. 58-2, at 3, 10, 15, 18, 22; ECF No. 58-6; ECF No. 58, at 38-

40.) The BOP COVID-19 information website does indicate that USP Allenwood is experiencing some COVID cases: three (3) inmates and two (2) staff have "confirmed active cases" of COVID at Mr. Ingram's facility. *See COVID-19 Coronavirus*, Federal Bureau of Prisons (last reviewed Oct. 28, 2020) https://www.bop.gov/coronavirus/. But the record does not indicate that the facility is not effectively managing the virus's impact.[3] This also does not counterbalance the Court's conclusion that release is inappropriate at this juncture.

The Court therefore concludes that Mr. Ingram's original sentence remains sufficient, but not greater than necessary, to meet all of the goals of sentencing, and that the extraordinary and compelling nature of Mr. Ingram's medical conditions do not outweigh the § 3553(a) factors.

### I.   <u>CONCLUSION</u>

Because Mr. Ingram provided the BOP with more than thirty (30) days to consider his Motion, the Court concludes that Mr. Ingram has complied with § 3582(c)(1)(A)'s exhaustion requirement and his motion is properly before it. The Court further concludes that Mr. Ingram's medical conditions of obesity and use of immunosuppressant medication, in combination with the risks posed by the COVID-19 pandemic, constitute "extraordinary and compelling" reasons. However, the Court concludes that the § 3553(a) factors weigh against compassionate release, making it inappropriate at this time. Accordingly, the Defendant's Motion to Reduce Sentence at ECF No. 58 is DENIED without prejudice.

s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated: October 30, 2020
cc:      All counsel of record

---

[3] Although Mr. Ingram has submitted concerns regarding a COVID outbreak at the nearby FCC Allenwood, where as of October 2, 2020, the Warden reported ninety-two (92) confirmed COVID cases, ECF No. 81-1, the BOP's reports of recorded cases do not currently indicate that Mr. Ingram's fears of spread to USP Allenwood, a distinct facility, have been realized.