# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) 2:12-cr-00203 |
| | ) |
| v. | ) Chief Judge Mark R. Hornak |
| | ) |
| ERIC ALAN SCOTT INGRAM, | ) |
| | ) |
| Defendant. | ) |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Before the Court is Mr. Eric Alan Scott Ingram's Renewed Motion for Reduction in Sentence under 18 U.S.C. § 3582(c)(1)(A)(i). (ECF No. 85.) The Court denied Mr. Ingram's first Motion for reduction in sentence under that provision in October 2020.[1] In its Opinion on that Motion, the Court determined that although Mr. Ingram had appropriately exhausted his administrative remedies and established the existence of extraordinary and compelling circumstances, the Court's required consideration of the § 3553(a) factors counseled against release. The Court therefore concluded that release was inappropriate at that time and denied Mr. Ingram's Motion without prejudice and subject to its reassertion should circumstances warrant. *Id.*

Based on the record supporting Mr. Ingram's renewed motion, the Court again concludes that the motion is properly before it and finds that Mr. Ingram's medical conditions continue to rise to an "extraordinary and compelling level." But the Court ultimately concludes that the sentencing factors set forth in 18 U.S.C. § 3553(a) continue to counsel against a reduction in Mr.

---

[1] The original Opinion includes information about Mr. Ingram's juvenile adjudications and appears under seal at ECF No. 82. The Court amended the opinion to redact information about Mr. Ingram's juvenile adjudications; that Amended Opinion appears, unsealed, at ECF No. 84.

1

Ingram's original sentence. Thus, Mr. Ingram's Renewed Motion for Reduction of Sentence under 18 U.S.C. § 3582(c)(1)(A)(i) at ECF No. 85 is DENIED without prejudice.

I.     **BACKGROUND**

The Court's previous Opinion denying Mr. Ingram's motion for compassionate release summarized the relevant background of this case; the Court will briefly recount that background here. (ECF No. 84.) In 2013, Mr. Ingram pled guilty to committing an unarmed bank robbery in violation of 18 U.S.C. § 2113(a). (ECF No. 29.) The sentencing court imposed a 168-month sentence after determining that Mr. Ingram was a "career offender" under the sentencing guidelines based on prior bank robbery convictions from 1992 and 1998. (ECF No. 45.) At the time Mr. Ingram made and reasserted his motion, he was incarcerated at U.S. Penitentiary (USP) Allenwood, a high security facility[2]. The BOP reports that he is scheduled to be released on April 18, 2024. Bureau of Prisons Inmate Locator, *Federal Bureau of Prisons*, https://www.bop.gov/inmateloc/ (last accessed June 23, 2021). Thus, as of the date of this Opinion, Mr. Ingram has served about 134 months of actual incarceration and has 34 months remaining on his sentence, not accounting for any "good time" credit yet to be applied. *See id.*

Mr. Ingram brought a motion for compassionate release in August 2020, asserting that a series of medical conditions increased his risk of contracting severe illness from COVID-19 and therefore constituted extraordinary and compelling circumstances justifying his release. (ECF No. 58.) The Court concluded that Mr. Ingram had properly exhausted his administrative remedies by satisfying § 3582(c)(1)(A)'s 30-day lapse provision; the Court also concluded that Mr. Ingram's obesity and use of immunosuppressant arthritis medication so increased his risk of contracting

---

[2] Currently, the BOP's on-line "Inmate Locator" advises that Mr. Ingram is located at the BOP's Oklahoma City Transfer Center. Bureau of Prisons Inmate Locator, *Federal Bureau of Prisons*, https://www.bop.gov/inmateloc/ (last accessed June 23, 2021).

severe illness from COVID-19 as to rise to an "extraordinary and compelling" level. But after evaluating Mr. Ingram's extensive criminal history, the Court determined that the required consideration of the Section 3553(a) factors counseled against his release. (ECF No. 84.) The Court therefore denied the motion.

Mr. Ingram renewed his motion in December 2019. (ECF No. 85.) His renewed motion argued that an increase in COVID-19 cases at the Allenwood facility after the Court's decision had increased the severity of the "extraordinary and compelling" risks posed by his health conditions, causing them to outweigh any consideration of the § 3553(a) factors that might weigh against his release. (ECF No. 85.) The Government opposed Mr. Ingram's renewed motion, arguing that the sources he cited did not report a surge in COVID-19 cases at that facility, and that Mr. Ingram had therefore failed to provide "new information" relating to his extraordinary and compelling circumstances or the § 3553(a) factors. (ECF No. 87.)

The Court held a hearing at which it received testimony about Mr. Ingram's rehabilitative efforts and release plan from three witnesses: Reverend Kevin Wells, director of the Baker Wells House; Reverend Etta Calvert, Mr. Ingram's mother; and Pastor Ben Wells, Mr. Ingram's brother. After the hearing and pursuant to the Court's Order (ECF No. 95), the Government filed a supplemental brief describing the Bureau of Prisons ("BOP") vaccination plan, to which Mr. Ingram responded. (ECF Nos. 96, 97.) The matter is now ripe for disposition.

Mr. Ingram is now 51 years old. Medical records from the BOP document that he suffers from multiple pre-existing medical conditions. (ECF No. 58-2, at 3, 4, 7, 8, 18, 21). Mr. Ingram reasserts that the conditions that the Court previously found rose to an "extraordinary and compelling" level–Mr. Ingram's obesity and his use of immunosuppressant arthritis medication, in combination with the COVID-19 pandemic–remain extraordinary and compelling. (ECF No.

58, at 1.)³ Mr. Ingram's renewed motion also refers the Court to the materials that Mr. Ingram submitted to support his initial motion, including letters from personal references and prison officials testifying to his efforts at rehabilitation while incarcerated. And Mr. Ingram now also proposes to the Court a release plan that includes plans for potential employment, continuing substance abuse treatment, and residence in a "three-quarters-house." (ECF Nos. 58-3, 58-4, 58-5, and 79.)

## II. LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007); *see also Dillon v. United States*, 560 U.S. 817, 819 (2010). One such specific authorization is the First Step Act's amendment of 18 U.S.C. § 3582. As amended, that provision allows a court to modify a defendant's term of imprisonment if "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i). In addition, the Court must consider: (1) whether the defendant has exhausted the appropriate administrative remedies; (2) the factors set forth in 18 U.S.C. § 3553(a) to the extent that they apply; and (3) whether such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. § 3582(c)(1)(A).

---

³ Mr. Ingram's initial motion also asserted that Mr. Ingram suffered from other medical conditions that he argued were extraordinary and compelling, including chronic Hepatitis C, rheumatoid arthritis, depression, and hyperlipidemia. (ECF No. 58.) The Court's prior Opinion concluded that it was unnecessary to consider these conditions because Mr. Ingram's obesity and use of immunosuppressant medication so increased his risk of contracting severe illness from COVID-19 that they were "extraordinary and compelling." The renewed Motion does not mention Mr. Ingram's previously asserted additional conditions (ECF No. 85.) If it did, the Court would again find it unnecessary to consider those conditions for the reasons previously noted.

4

## III. DISCUSSION

### A. Administrative Exhaustion

Before reaching the merits of Mr. Ingram's motion, the Court must first determine whether Mr. Ingram has complied with § 3582(c)(1)(A)'s exhaustion requirement. Before petitioning a court for relief under § 3582(c), a defendant must first file an administrative request for compassionate release with the warden of their facility and then either: (1) fully exhaust the Bureau of Prison's ("BOP") administrative remedies; or (2) wait thirty days from the date their administrative request was filed with the warden. The Third Circuit has confirmed that either of § 3582(c)(1)(A)'s options (acting independently of one another) can satisfy the exhaustion requirement. *See United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020) (rejecting the argument that a defendant must exhaust the administrative remedy process if the warden denies a request within 30 days of receiving it, because "the statute states that the defendant may file the motion [before a district court] thirty days after the warden receives his request").

The Court determined in in its previous Opinion that Mr. Ingram had exhausted his administrative remedies under the § 3582(c)(1)(A) "thirty-day-option" as follows. (ECF No. 84.) To summarize: Mr. Ingram submitted his request for reduction in sentence to his facility's Warden on April 27, 2020, which sought relief based on the grounds that Mr. Ingram's "serious preexisting health concerns" would "compromise [Mr. Ingram's] ability to survive in prison since the outbreak of the COVID-19 pandemic." (ECF No. 58-1, at 1.) The Warden issued a response denying Mr. Ingram's request on May 8, 2020 (ECF No. 58-1, at 48), and Mr. Ingram filed his motion for reduction in sentence on August 10, 2020. (ECF No. 58 at 4.) Because more than thirty days had passed between the Warden's denial of Mr. Ingram's request and the filing of his Motion, the Court concluded that Mr. Ingram had exhausted his administrative remedies.

Mr. Ingram's renewed motion raises substantially the same arguments that he exhausted in his petition to the Warden. (ECF Nos. 58, 85.) His renewed motion raises as a new argument only the assertion the COVID-19 conditions had worsened at the Allenwood facility–a circumstance that he argues increases the risk posed by the medical conditions that he already asserted in his petition. (ECF No. 85, at 2.) Exhaustion is therefore also met for Mr. Ingram's renewed Motion and the Court has the authority to rule on his renewed motion for reduction in sentence. The Court will proceed accordingly.

### B. <u>Extraordinary and Compelling Circumstances</u>

The Court next concludes that Mr. Ingram's asserted medical conditions continue to be "extraordinary and compelling" so that § 3582(c)(1)(A)(i) might permit his release. Section 3582 does not define the phrase "extraordinary and compelling reasons." Instead, Congress delegated that task to the Sentencing Commission. *See* 28 U.S.C. § 994(t) (stating that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). The Sentencing Commission defined "extraordinary and compelling" as it related to the BOP's discretion under the pre-First Step Act version of § 3582(c)(1)(A)(i), but has not updated the applicable Policy Statement, found in the U.S. Sentencing Guidelines Manual ("the Guidelines"), since the First Step Act became law. *See United States v. Rodriguez*, 451 F. Supp. 3d 392, 396 (E.D. Pa. Apr. 1, 2020).

A question that arises here, and has arisen in similar cases, is whether, and if so to what degree, the current provisions of the Guidelines and relevant Application Notes at U.S.S.G. § 1B1.13 promulgated by the Sentencing Commission in 2018 apply in consideration of this Motion. As a general matter, this Court has been of the view that those provisions of the Guidelines are

informative but not controlling and in any event advisory. *See, e.g.*, *United States v. Davidson*, No. 16-00139, 2020 WL 4877255, at *17–18 (W.D. Pa. Aug. 20, 2020). Over the past few months, a number of the regional Courts of Appeals have considered this issue and all but one have held that those Guidelines provisions are not controlling and limiting in the consideration of compassionate release motions. *See United States v. Long*, No. 20-3064, 2021 WL 1972245, at *8–9 (D.C. Cir. May 18, 2021); *United States v. Aruda*, No. 20-10245, 2021 WL 1307884, at *4 (9th Cir. Apr. 8, 2021) (*per curiam*); *United States v. Shkambi*, No. 20-40543, 2021 WL 1291609, at *2–4 (5th Cir. Apr. 7, 2021); *United States v. McGee*, No. 20-5047, 2021 WL 1168980, at *12 (10th Cir. Mar. 29, 2021); *United States v. McCoy*, 981 F.3d 271, 281–84 (4th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1109 (6th Cir. 2020); *United States v. Brooker*, 976 F.3d 228, 234–37 (2d Cir. 2020); *but see United States v. Bryant*, No. 19-14267, 2021 WL 1827158, at *13 (11th Cir. May 7, 2021) (holding that § 1B1.13 is an applicable, binding policy statement for all section 3582(c)(1)(A) motions).[4] And in this case and in others in this Court, it has been the position of the United States that § 1B1.13 is so limiting,

---

[4] This Court finds particularly persuasive the portions of Judge Martin's dissent in *Bryant* that observe that applying U.S.S.G. § 1B1.13 and its Application Note 1(D) to compassionate release motions filed not by the BOP but by a defendant would result in an unauthorized sub-delegation of authority to the BOP. *Bryant*, 2021 WL 1827158, at *22. The actual text of the Guideline authorizes the Court when such a motion is pending to reduce a sentence if "extraordinary and compelling reasons warrant the reduction." U.S.S.G. § 1B1.13(1)(A). But it is only in Application Note 1 (and not in the Guideline itself) that the Sentencing Commission outlined such reasons definitionally, closing with a "catch all" provision, "Other Reasons," in subsection (D). That Application Note provides that such conditions could exist if the Director of the BOP determined that they existed (without any Guideline or Application Note assistance provided) *as to that particular defendant in that particular case*.

This Court finds persuasive the *Bryant* dissent's assessment that giving that provision conclusive force as to a defendant-filed motion would be both an impermissible sub-delegation of authority to the BOP, and would be counter to the purposes of the First Step Act which was aimed at removing the BOP's exclusive role as to such motions, since in a circular fashion it in effect flips the release decision back to the BOP and away from the Court. And beyond that, given that the Guideline itself does not endeavor to define the term "extraordinary and compelling" at all, instead leaving it to an Application Note that drops most of that definitional work into the lap of the Director of the BOP, this Court harbors meaningful doubt that such an approach, and the Application Note itself, would retain vitality in light of the *en banc* decision of our Court of Appeals in *United States v. Nasir*, 982 F. 3d 144, 156–60 (3d Cir. 2020), and its limitations on when the text of an Application Note may permissibly expand the reach of the Guideline itself.

notwithstanding that the Sentencing Commission has not considered or updated those provisions since Congress passed and the President signed into law the First Step Act. *See id.*

This issue is now before our Court of Appeals in a significantly different and perhaps more consequential permutation in *United States v. Andrews*, in which the key issue before that Court is whether a court's discretion to determine and define "extraordinary and compelling reasons" is constrained by U.S.S.G. § 1B1.13 and its commentary, specifically in circumstances when such are asserted to exist due to a gross disparity between a sentence originally imposed and a sentence that would be imposed today for the same crime. 480 F. Supp. 3d 669 (E.D. Pa. 2020), *appeal docketed,* No. 20-2768 (3d Cir. Sept. 4, 2020).

This case instead involves a request for relief based on Mr. Ingram's current medical conditions. Although it appears that the central issue in *Andrews* is broader and possibly of greater reach than the central issue in this case, the involved statutory and Guidelines provisions suggest that a defendant's medical conditions are a topic central to the principles that have animated the concept of such release from its first appearance in the law. For our purposes, the only issue that need be addressed and resolved now is whether the referenced Guidelines provisions are controlling and therefore set and limit the scope of the factors that the Court may consider. To that extent, we join the view of the strong majority of the decisions noted above in concluding that the provisions of U.S.S.G. § 1B1.13 and its Application Notes are not limiting in deciding this issue in the context presented here. The provisions of U.S.S.G. § 1B1.13 and its Application Notes do not serve as a binding limitation on the factors or information that this Court may consider in deciding this specific Motion on the grounds presented in this case, but the Court will nonetheless consider them as an advisory part of its analysis in determining the issue now before the Court.

Relevant here, the Application Notes to § 1B1.13 of the Guidelines articulate two types of medical conditions that can rise to an "extraordinary and compelling" level: (1) terminal illnesses; and (2) non-terminal conditions that substantially diminish the ability of the defendant to provide self-care within the correctional environment. The Sentencing Commission's Policy Statement suggests that non-terminal medical conditions may constitute extraordinary and compelling reasons if "a defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." § 1B1.13, cmt. n.(1)(A)(ii).

In its Opinion on Mr. Ingram's initial motion, the Court determined that Mr. Ingram established that his obesity and use of immunosuppressant medication so raised his risk of contracting severe illness from COVID-19 so as to rise to an "extraordinary and compelling" level that could support his release. (ECF No. 84.) First, the Court determined that Mr. Ingram's BOP-documented height of 5'9" and weight of 225 pounds yielded a Body Mass Index (BMI) of 33.2 on a publicly available BMI-screening calculator. (PSR ¶ 51; ECF No. 58-2, at 8.) And second, the Court found that Mr. Ingram's BOP medical records showed that Mr. Ingram required and regularly received injections of a type of "corticosteroid" medication with known immunosuppressant effect to treat his arthritis. Because the Centers for Disease Control and Prevention included both conditions on its list of conditions that either "might" or "did" increase the risk of contracting severe illness from COVID-19, the Court determined that they reached an extraordinary and compelling level.

The Court now concludes that Mr. Ingram's medical conditions remain "extraordinary and compelling" in the light of the COVID-19 pandemic. The CDC has changed the terminology it

uses to describe the conditions that increase risk of contracting severe COVID-19 since Mr. Ingram's initial petition, removing the separate lists of conditions that "might" and "do" increase COVID-19 risk in favor of listing conditions that "can" increase COVID-19 risk. But the CDC website still lists both obesity and an immunosuppressed state caused by corticosteroid use as conditions that "can make you more likely to get severely ill from COVID-19." *See* Ctrs. for Disease Control & Prevention, *People with Certain Medical Conditions*, https://bit.ly/3iZBI5M (last updated May 13, 2021). The Court therefore finds that Mr. Ingram's medical conditions continue to constitute "extraordinary and compelling" circumstances in light of the COVID-19 pandemic.

Mr. Ingram's renewed motion, filed on December 7, 2020 argued that a COVID-19 outbreak at his then-current place of incarceration elevated the risks posed by his medical conditions. Mr. Ingram asserted in his motion that USP Allenwood was experiencing a "serious outbreak" of COVID-19 cases at the time of filing, that this outbreak dramatically increased Mr. Ingram's risk of contracting COVID-19, and that this increased risk should thus change the Court's assessment of the "balance" between the extraordinary and compelling circumstances and the Section 3553(a) factors. (ECF No. 85, at 2.)

In support of this argument, Mr. Ingram included graphs from the Office of Inspector General that showed a serious spike in COVID cases at FCC Allenwood in the months after the Court's denial of Mr. Ingram's initial motion. (ECF No. 84, at 3) (citing the Office of the Inspector General's (OIG) Interactive Dashboard, https://bit.ly/3eUIycA). Citing OIG sources also accessed on December 7, 2020, Mr. Ingram's motion reported that FCC Allenwood had experienced a dramatic surge in COVID-19 cases, with 218 active cases among inmates and 13 active cases among staff. (ECF No. 84, at 3.) And Mr. Ingram also cited OIG sources that, at the time of the

briefing, apparently reported 126 COVID-19 positive inmates and seven positive staff specifically at USP Allenwood. (ECF No. 85, at 4.) Mr. Ingram also cited BOP reports of 136 inmates with positive tests at USP Allenwood from December 7, 2020. (ECF No. 85, at 4.)

But the situation at USP Allenwood appears to have rapidly changed after Mr. Ingram renewed his motion. By the time that the Government filed its brief in opposition less than a week later, the same sources that Mr. Ingram cited showed that USP Allenwood reported zero (0) active cases among inmates and 14 active cases among staff. *See* COVID-19 Coronavirus, *Federal Bureau of Prisons*, https://www.bop.gov/coronavirus/ (accessed Dec. 18, 2020). And when the Court accessed the OIG "map series" that Mr. Ingram had cited on December 18, 2020, that series reported 70 total active cases among inmates and 37 active cases among staff at FCC Allenwood. *See Facility-Level BOP COVID-19 Trends*, Office of the Inspector General, https://bit.ly/38nTixc (accessed Dec. 18, 2020).

The OIG website has recently been updated to include a "Facility Case Trends" data set that shows the trends of active COVID-19 cases over time at individual BOP facilities. *See* Facility Case Trends, *Bureau of Prisons*, https://bit.ly/360g25D (accessed June 23, 2020). That page confirms that active COVID-19 cases among inmates at USP Allenwood spiked in November 2020: Positive COVID-19 cases increased from 3 inmate cases reported on November 2, 2020, to a high of 126 cases reported between November 25 through 29, 2020. *Id.* However, case numbers then fell just as rapidly. On December 3, 2020, the facility reported only three active inmate cases. And by December 12, 2020, the facility reported zero active inmate cases. *Id.* USP Allenwood has not reported an active COVID-19 case among inmates since March 18, 2020. *Id.*

The OIG map series now reports no active cases among inmates or staff at any of the three FCC Allenwood facilities. *See Facility-Level BOP COVID-19 Trends*, Office of the Inspector

11

General, https://bit.ly/38nTixc (last updated June 20, 2021). The Allenwood facilities also do not appear on the BOP's COVID-19 case map, corroborating the OIG's report that those facilities currently have no active COVID cases. COVID-19 Cases, *Federal Bureau of Prisons*, https://www.bop.gov/coronavirus/ (accessed June 23, 2021). In terms of vaccination progress, FCC Allenwood as a whole reports having completed 418 staff inoculations and 1448 inmate inoculations. *Id.* At the Oklahoma City Transfer Center facility where Mr. Ingram is now being held ("FTC Oklahoma"), the BOP reports five active COVID-19 cases among staff and zero active inmate COVID-19 cases out of the 1,333 total inmates that facility currently holds. *Id.*; Population Statistics, *Federal Bureau of Prisons*, https://bit.ly/3qmSRf1 (last updated June 10, 2021). The BOP also reports that FTC Oklahoma has completed 136 staff vaccinations and 321 inmate vaccinations. COVID-19 Vaccine Implementation, *Federal Bureau of Prisons*, https://www.bop.gov/coronavirus/ (last accessed June 23, 2021).

The Court does not doubt that Mr. Ingram's renewed motion accurately represented the number of active COVID-19 cases those sources reported when it was filed. The "Facility Case Trends" data illustrates as much, and USP Allenwood now lists 904 inmates as "recovered", reflecting that it did experience many inmate cases over the pandemic's course. *Id.* But there do not appear to be any active COVID-19 cases at USP Allenwood now, and the information available on the BOP's on-line "locator" system indicates that, in any event, Mr. Ingram is no longer resident at the Allenwood facility[5]. The Court's assessment of the extraordinary and compelling circumstances at issue – and how they measure up against the § 3553(a) factors – is therefore unchanged by the current situation at USP Allenwood.

---

[5] Neither Mr. Ingram's counsel nor counsel for the United States has provided updated information to the Court relative to Mr. Ingram's location, nor information that is either contrary to or explanatory of the information contained in the BOP's on-line "locator" site.

The Court's assessment of the extraordinary and compelling circumstances at issue is also unchanged by the Government's most recent supplemental filing detailing the Bureau of Prisons' overall vaccination policies and procedures. The Government's supplemental brief at ECF No. 96 reports on the BOP's vaccination plan as it stood in March 2021. Broadly, the Government reports that the BOP's first priority is to vaccinate those inmates in health service unit job assignments; the second priority group is those inmates age 65 or older and those inmates who "are" at increased risk for severe illness from COVID-19, as defined by one list of medical conditions; and the third priority is to vaccinate those aged 50 through 64 and those of any age with underlying conditions that "might" increase COVID-19 risk, defined by a second list of medical conditions. (ECF No. 96.) Although the Government did not indicate when the BOP would offer Mr. Ingram a vaccine, it argued that the Court should account for the BOP's general vaccination plans and the vaccines' effectiveness when assessing whether Mr. Ingram's conditions are "extraordinary and compelling." *Id.*

The Court disagrees. The information in the Government's supplemental filing does not impact the Court's assessment of Mr. Ingram's risk of contracting severe illness from COVID-19. First, the Government did not submit any actual information about the vaccine's availability or administration specifically at USP Allenwood, nor has it been updated to reflect such information for the location at which Mr. Ingram now resides, if he is no longer at Allenwood. Second, the general BOP guidance that the Government did submit showed that even when the vaccine did become available at the Allenwood facility, Mr. Ingram would not have been in the first vaccine priority group. And finally, the Government did not assert that Allenwood had any vaccines available or identify a date when the first shot of the multi-shot vaccines might be available to Mr. Ingram, either at USP Allenwood or FTC Oklahoma–let alone identify a date when Mr. Ingram

13

could complete a multi-shot vaccine regime no matter where he was resident, which would allow the Court to assess when he would have the vaccine's full protection[6]. (ECF No. 97, at 3.). And no vaccination information has been presented to the Court relating to Mr. Ingram's current location at FTC Oklahoma. In these regards, the record before the Court does not provide a factual basis to consider this issue in the specific context of Mr. Ingram's situation.

In sum, Mr. Ingram's obesity and use of immunosuppressant medication continue to pose a risk of contracting severe illness from COVID-19 that rises to an "extraordinary and compelling" level. The Court concludes that the extraordinary and compelling nature of that risk is not heightened by conditions at USP Allenwood, where there are currently no COVID-19 cases among inmates or staff. And because the Government provides no specific information about Mr. Ingram's actual vaccination status or the timeline for his full vaccination, the Court also concludes that the extraordinary and compelling nature of Mr. Ingram's risk is not impacted by the general BOP vaccination plan that the Government reports.

The risks posed by Mr. Ingram's medical conditions therefore remain as significant as they were when the Court assessed his initial motion: they are sufficiently "extraordinary and compelling" that they may justify release under the statute if that release is appropriate in light of the statute's required consideration of the § 3553(a) factors. That said, as the Court details below, release is not appropriate at this time in light of those factors.

---

[6] Nonetheless, as of June 23, 2021, the BOP's website indicates that there was a total of 2,568 inmates overall at the three (3) Allenwood FCC facilities, and there were 1448 inmates fully vaccinated. Population Statistics, *Federal Bureau of Prisons*, https://www.bop.gov/mobile/about/population_statistics.jsp#pop_totals (last updated June 10, 2021); COVID-19 Vaccine Implementation, *Federal Bureau of Prisons*, https://www.bop.gov/coronavirus/ (last accessed June 23, 2021).

### C. The Section 3553(a) Factors

Even though the Court finds that on the record now before it, there is an "extraordinary and compelling" reason sufficient to authorize Mr. Ingram's release, it must also consider whether release is appropriate in light of the factors set forth in § 3553(a). Specifically, "in considering the section 3553(a) factors, [the Court] should assess whether those factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *United States v. Bess*, 455 F. Supp. 3d 53, 66 (W.D.N.Y. Apr. 22, 2020) (citation omitted).

The determination of "whether to reduce an eligible defendant's term of incarceration for compassionate release after considering the § 3553(a) factors is committed to the discretion of the [district court]." *United States v. Jones*, No. 12-38, 2020 WL 3871084, at *4 (W.D. Pa. July 8, 2020) (citing *United States v. Pawlowski*, 967 F.3d 327 (3d Cir. June 26, 2020)). That discretion includes the district court's authority to consider the length of the defendant's original custodial sentence, including the portions served and remaining, when weighing the § 3553(a) factors. *Pawlowski*, 967 F.3d at 330–31.

The Court thoroughly evaluated the § 3553(a) factors in its prior Opinion and concluded that, despite commendable signs of rehabilitation, two of the § 3553(a) factors significantly militated against Mr. Ingram's release: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the original sentence to deter future criminal conduct and to protect the public from further crimes by the defendant. (ECF No. 84.)

Through his renewed motion and the evidentiary hearing on that motion, Mr. Ingram has now provided the Court with additional information about his release plan. Mr. Ingram proposes a plan to stay at the Baker Wells House, a "three-quarters-house" and rehabilitative facility in

Pittsburgh, under the guidance of the House's Director, Reverend Kevin Wells. Reverend Wells testified that the Baker Wells House has a private room available for Mr. Ingram, is within walking distance of the church that Mr. Ingram attends, and enforces a curfew and has the capability to do electronic monitoring and drug testing. Reverend Wells also testified that although he remains involved in the Baker Wells House programming, he does not reside at the House. Mr. Ingram's brother, Pastor Benjamin Calvert, and Mr. Ingram's mother, Reverend Etta Calvert, also testified to having seen a sincere rehabilitative change in Mr. Ingram. They both committed in their testimony to personally supporting his continued rehabilitation if he were released. Mr. Ingram therefore argues that, if released, he will not return to the same environment in which he committed his prior offenses.

Mr. Ingram also points again to empirical evidence showing that offenders aged 50 and older are the least likely to recidivate. Because he is now over 50 years old, Mr. Ingram argues that he falls within the age category of offenders least likely to recidivate. (ECF No. 58, at 6.) And he again points to the exhibits submitted in support of his original motion that illustrated his positive institutional behavior while incarcerated. These exhibits include a letter from his counselor commending his general rehabilitation and his role as a mentor to other inmates and a note from a doctor praising Mr. Ingram's initiative, dedication, and artistic capabilities related to his contribution of a mural to the Psychology Services Department. (ECF Nos. 85, at 6; 58-3; 58-4.)

But Mr. Ingram's extensive criminal history indicates that the threat of recidivism and danger to the community remain serious. The Court's prior Opinion recounted Mr. Ingram's criminal history in detail. Because of the seriousness of Mr. Ingram's offense conduct leading to his prior convictions and the importance of Mr. Ingram's history of recidivism to the § 3535(a) factors' application, the Court it will also summarize that history here. First, Mr. Ingram's criminal

history began with a serious juvenile conviction. Then, at the age of 21, he stole a taxicab at knife point and pled guilty to robbery, serving around 8-9 months in prison. Two months after being paroled for this offense, Mr. Ingram was arrested for simple assault for attempting to cause bodily injury to his mother by slamming a door on her arms; he was found guilty of disorderly conduct and ordered to pay a fine.

Then, in February 1992, two months after Mr. Ingram was paroled for that offense, he was arrested for simple assault and found guilty of disorderly conduct for an incident in which he attempted to cause bodily injury to his mother. (PSR ¶ 25.) One week after his disorderly conduct conviction and two and a half months after being paroled for his robbery conviction, Mr. Ingram robbed a bank by handing the teller a note demanding money and stating that he possessed plastic explosives that he would use if he saw the police. (PSR ¶ 26.) Less than a month later, Mr. Ingram committed two bank additional robberies in identical fashion at different banks. (PSR ¶ 26.) Mr. Ingram pled guilty to Bank Robbery and was sentenced to eighty-four (84) months imprisonment. (PSR ¶ 26.) In July 1998, he was released from prison and was placed on supervised release.

Twenty-one days after his release from that period of imprisonment, in July 1998, Mr. Ingram robbed another bank by handing the teller a note that demanded money and stated that he had explosives. (PSR ¶ 27.) He pled guilty to bank robbery, was sentenced to 151 months' imprisonment, and was released in May 2011. (PSR ¶ 27.) And finally, around nine months after his release for that 1998 offense, Mr. Ingram engaged in the criminal conduct that resulted in the prosecution and sentence at issue: in February 2012, Mr. Ingram robbed another bank, again using a note that demanded money and threatened the use of explosives. The next day, he robbed yet another bank in the same manner. Again, Mr. Ingram pled guilty to bank robbery and received a sentence of 68 months imprisonment. (ECF No. 45.)

17

In sum, between 1992 and 2012, Mr. Ingram robbed six banks. In all instances, he did so while on parole or supervised release, and shortly after being released from confinement for prior offenses. And although Mr. Ingram was actually unarmed in all of those instances, he committed those robberies using notes that threatened the use of explosives. Those repeated threats of violence only add to the tangible and genuine concern for public safety posed by Mr. Ingram's prior multiple convictions for robbery while he was on some form of formal supervision and for disorderly conduct. (PSR ¶¶ 23, 25.) Finally, the Court also notes that Mr. Ingram is not scheduled for release until April 18, 2024 and still has 34 months remaining on his sentence. The substantial time remaining on Mr. Ingram's sentence also weighs against his release.

The Court credits the detailed release plan Mr. Ingram proposes, the support promised by the witnesses who testified on his behalf, and the reference letters describing indications of his rehabilitation. But taken as a whole, Mr. Ingram's lengthy record of criminal convictions for very serious offenses demonstrates to the Court that an early release would substantially undermine the sentencing goals of protecting the public and deterring Mr. Ingram from further future criminal conduct. Thus, the Court concludes that on the record before it, the "extraordinary and compelling" nature of Mr. Ingram's medical conditions does not counterbalance the application of the § 3553(a) factors. Instead, the Court continues to find that in light of Mr. Ingram's persistent recidivism involving serious and high-risk conduct while on supervision, the Section 3553(a) factors weigh against and preclude his release at this time.

### IV. <u>CONCLUSION</u>

Mr. Ingram based his renewed motion on the assertion that USP Allenwood was experiencing such a serious outbreak of COVID-19 cases that the Court should find the risks posed by Mr. Ingram's medical conditions sufficiently severe to outweigh the § 3553(a) factors weighing

against his release. Although the Court does not doubt that the sources Mr. Ingram cites reported high case numbers at USP Allenwood when he renewed his motion, those same sources reported much lower case numbers by the time the Government filed its response; it appears that Mr. Ingram is no longer at Allenwood, and in any event, USP Allenwood currently reports no active COVID-19 cases and appears to be in the process of implementing the BOP's inmate vaccination plan. Therefore, although Mr. Ingram's medical conditions increase his risk of contracting severe illness from COVID-19, the risks that those conditions pose to his health remains unchanged from the assessment of those risks in the Court's prior Opinion.

The Court has also considered again the relevant factors set forth in § 3582(c), as well as the applicable policy statements issued by the Sentencing Commission and the factors set forth in § 3553(a). Because the BOP has had more than 30 days to consider Mr. Ingram's asserted medical conditions, the Court finds that Mr. Ingram has exhausted his BOP administrative obligations and that his motion is properly before it. The Court also concludes that Mr. Ingram has established that his obesity and use of immunosuppressant medication so raise his risk of contracting severe illness from COVID-19 as to rise to an "extraordinary and compelling" level that could support his release. But the Court also concludes that the Section 3553(a) factors weigh against compassionate release, making it inappropriate at this time. Accordingly, the Defendant's Renewed Motion to Reduce Sentence at ECF No. 85 is DENIED without prejudice.

s/ Mark R. Hornak<br>
Mark R. Hornak<br>
Chief United States District Judge

Dated: June 23, 2021
cc:     All counsel of record